**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2024-CA-00418-COA**

IN THE MATTER OF THE ESTATE OF                     **APPELLANT**
PATRICIA FLEISHHACKER, DECEASED:
GINA WARD

v.

CINDY EDWARDS                                   **APPELLEE**

DATE OF JUDGMENT:          03/11/2024
TRIAL JUDGE:              HON. JACQUELINE ESTES MASK
COURT FROM WHICH APPEALED:  LEE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     W. BRENT McBRIDE
ATTORNEY FOR APPELLEE:      JONATHAN W. MARTIN
NATURE OF THE CASE:         CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:              AFFIRMED - 11/04/2025
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., WESTBROOKS AND EMFINGER, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1.    This appeal stems from a will contest between Gina Ward, the sole natural child of the deceased, Patricia Fleishhacker, and Cindy Edwards, Patricia's sister. The trial court accepted Cindy's petition to probate Patricia's 2005 will, which left Patricia's estate to Cindy. Gina filed a counterclaim, alleging that Patricia executed a subsequent holographic will in 2018, leaving the majority of Patricia's estate to Gina. This will, however, was never found.

¶2.    Ultimately, the trial court denied Gina's request to probate the lost holographic will, instead finding Patricia's 2005 will valid. Gina filed a motion to reconsider, which the trial court denied because Gina failed to prove the lost holographic will was properly executed.

For the sake of completion, the trial court addressed the remaining issues, again finding in Cindy's favor. Most pertinent here, the court found that Gina failed to overcome the presumption that the lost will had been destroyed or revoked by Patricia. Gina appealed, arguing the trial court's ruling was in error under the facts of the case. Finding no reversible error, we affirm.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

¶3. In June 2021, Patricia passed away unexpectedly at her residence in Belden, Mississippi, near Tupelo. It was estimated she died around June 6, 2021, but her body was not found until June 20, 2021. At the time of her death, Patricia was divorced and living alone. Both of Patricia's parents had predeceased her. Her surviving family included her sister, Cindy; her brother, Mike Powell; and her adult daughter, Gina, whom Patricia had placed for adoption as a newborn.

¶4. When Patricia was seventeen years old, she gave birth to Gina, who was adopted by Dee Ward and his wife. The Wards lived in Kansas. In 1986, when Gina turned eighteen years old, the adoption agency informed the Wards that Patricia wanted to meet Gina. After a discussion, Gina and her parents agreed to Patricia's request. On Patricia's first visit to Kansas, she brought Gina eighteen birthday gifts, one for each year since the adoption. Over the following years, Gina and Patricia developed a very close relationship.

¶5. Even so, on December 9, 2005, Patricia executed an undisputedly valid will, devising her entire estate to her parents and naming Cindy as alternate executrix after her father, Hollis Powell. This will was two pages, typed, and attested by two subscribing witnesses.

2

The will instructed that if Patricia survived her parents, then her sister Cindy was the sole beneficiary: "[I]n the event I am not survived by either of my parents, I hereby devise and bequeath all of my estate, both real and personal, and wherever located, to my sister, Cindy Edwards."

¶6.     Gina and Patricia were on good terms until approximately 2012, when Gina confronted Patricia about her failure to repay a 2005 loan Gina made.  At that time, Patricia was getting a divorce and borrowed $10,000 from Gina, agreeing to pay it back in ninety days.  Patricia, however, failed to do so.  Gina also objected to Patricia's drinking and gambling habits.  Although Patricia continued to send Gina cards and gifts after their fall-out in 2012, they did not resume communication until 2017, when they reconciled.  Gina and Patricia remained on good terms until Patricia's death, communicating almost daily.  Gina would also visit Patricia for weeks at a time.

¶7.     In January 2016, the relationship between Patricia and her sister, Cindy, declined around the time their mother died.  Patricia and Cindy disagreed about their mother's care, and Patricia felt that Cindy's placing their mother on hospice care hastened her death.  The sisters continued to be estranged until the time of Patricia's death in 2021.  Gina testified that Patricia and Cindy's strained relationship precipitated the creation of the 2018 will, leaving Patricia's estate to Gina.

¶8.     According to Gina, during the summer of 2018, Patricia made and executed a holographic will.  Gina insists that she saw Patricia complete the holographic will and read it.  The will was on a white, legal-size sheet of paper, handwritten in red ink and in Patricia's

3

handwriting, as well as signed and dated by her. Gina testified it was entitled, "Last Will and Testament of Patricia A. Fleishhacker," after which it stated, "I will my assets, my property, my finances to my daughter, Gina Ann Ward." Gina testified Patricia put a clause in the will to take care of her grandfather's needs for continued care out of her estate. Additionally, the will made two specific bequests: a gift of $1,000 to the local humane society and a yellow diamond ring to her best friend, Betty Caldwell.[1] Gina testified that Patricia kept this will on her kitchen table, and Gina saw it every time she visited Patricia's house.

¶9. In February 2020, Patricia and Cindy's father passed away. A will contest ensued between Patricia and Cindy over Powell's 2011 will that was filed for probate, and a subsequent will submitted by Patricia from 2018. Attorney Jak Smith represented Patricia.

¶10. In November 2020, after Patricia suffered a fall that impacted her mobility, Gina traveled from Kansas to Mississippi to care for Patricia. Gina testified, however, that her mother's mental health was "fine."[2] With each trip, Gina moved some of her belongings to Patricia's home. Additionally, Gina was also caring for her adoptive father, Dee Ward, in Kansas. On May 5, 2021, Gina traveled to Patricia's house, staying about two to three weeks. Gina testified that during this time, Patricia gave her a key to the house and lockboxes at the bank. Around May 28, Gina returned to Kansas for surgery. After surgery,

---

[1] The trial court found the Humane Society and Betty Caldwell to be indispensable parties and joined them in the action, positioned with Gina. Each was served with notice but did not appear as directed.

[2] Patricia's testamentary capacity was never at issue in this case.

Gina was unable to talk or drive; thus, she communicated with Patricia by text message. Gina's last text message exchange with Patricia was around June 4, 2021. Attorney Smith testified he spoke with Patricia on that day and, at her request, dropped off some items (Gatorade, crackers, and yogurt) on her porch.

¶11. On June 20, 2021, Patricia's housekeeper, Tanya Barnes, who had been on vacation from late May to early June, became concerned when she was unable to reach Patricia by telephone. Tanya knew Patricia had not been feeling well and went to Patricia's house to check on her, but Patricia did not answer the door. She noticed the mailbox was full, and packages were by the front door. Tanya called the police to perform a wellness check, which resulted in their finding Patricia deceased. It was estimated that Patricia had been dead for approximately two weeks. Gina, Cindy, and Smith were all notified of Patricia's death.

¶12. The next day, Cindy filed a petition to probate Patricia's 2005 will, attaching a copy of the document. Later that night, Gina arrived in Tupelo and visited with Smith at his office. Gina testified that Smith instructed her to try to find the holographic will in Patricia's house. On June 22, 2021, Gina contacted Tanya to accompany her to Patricia's house, where they searched for the 2018 will without success. Gina testified that "[n]othing . . . really looked out of the ordinary. A few things had been moved on the table, I did notice that. Stacks had been moved around." They could only stay in the house for ten to fifteen minutes, however, because the odor was unbearable.

¶13. On June 23, 2012, Gina spoke with Smith again and then returned to Patricia's

5

residence. Smith advised Gina that Cindy had a copy of the 2005 will that nominated Cindy as executrix. Cindy and her husband had also returned to the house to make sure it was secure. Cindy testified Gina told her that "she had a will and [that Cindy] had no right to be there." Cindy testified that Gina called the police. Cindy did not enter the house, but Smith suggested that he, Cindy's husband, and the police officers "walk through" the house. Because there was a dispute over the estate, law enforcement recommended that the front door be chained and padlocked. Gina testified that she never entered the house again, even though she had keys to it, due to the chains and padlock.

¶14. On June 24, 2021, John Barnes, Tanya's husband, took photographs outside Patricia's house, which were entered into evidence. The photographs showed the truck of Cindy's husband parked in the driveway of Patricia's house, trash taken out of the house and put on the curb, and the padlocked chains on the front door. The trash consisted of some of Gina's clothing that she had left at the house. Additionally, Cindy is shown outside the residence. However, at trial, Cindy testified that she did not enter Patricia's house from June 23 until early July.

¶15. On June 25, 2021, the court entered an order admitting the 2005 will to probate and appointing Cindy as executrix. On June 29, 2021, Gina responded by moving for injunctive relief, in which she explained that she was assured numerous times by Patricia that she "would be inheriting from her." Based upon these statements, Gina "believe[d] that Patricia . . . executed another will after the 2005 will or revoked the 2005 will." Gina claimed that "if Patricia did another will, it is probably located in the safe . . . or it is in the lockbox" at

6

her bank. However, nobody had the combination to Patricia's home safe.

¶16.    Cindy testified that on July 2, 2021, she entered Patricia's house to remove laundry, food, and garbage. On September 24, 2021, the court granted Gina's request to enjoin in part, entering an agreed order to open the safe deposit boxes at the bank and hire a locksmith to open the home safe. The parties and their attorneys were present and videotaped the openings. The safe deposit boxes were empty. The home safe included various personal property, newspaper clippings, and the original 2005 will, which had not been marked or damaged in any way.

¶17.    In November 2021, Gina filed a counterclaim, petitioning to probate the 2018 will that she claimed was lost. Gina claimed that Patricia mentioned the 2018 will to five individuals: David Reynolds, Gina's former boyfriend; Dale Pounds, Patricia and Cindy's first cousin; Billy Hugh Campbell, Patricia and Cindy's uncle; Sam Patrick, Patricia's handyman; and Dee Ward. Depositions of these witnesses were conducted on March 1, 2022, in addition to the depositions of Tanya Barnes and Jak Smith. The parties stipulated the admission of the deposition testimony into evidence.[3] According to witness testimony, Patricia had told Gina, Reynolds, Patrick, Ward, Tanya, Pounds, and Campbell about her 2018 will leaving her estate to Gina. However, Pounds, Campbell, and Smith testified that they never saw the 2018 will. Only Gina, Ward, and Reynolds ever read any part of the will.

_____

[3] Deposition testimony for probate of a will is admissible under Mississippi Code Annotated section 91-7-29 (Rev. 2021). The chancellor lamented that while this process is allowed, it "obscures the role of the [c]ourt in this instance to weigh the witnesses' credibility by observing their appearance, demeanor and tone, or to present its own questions to them, in assessing whether the statutory requirements have been fulfilled."

¶18. In August 2022, a final hearing occurred, with live testimony by John Barnes, Gina, and Cindy. On October 3, 2023, the trial court issued a bench ruling, finding there was insufficient proof to establish the proper execution, existence, or contents of the 2018 will. The same day, the court issued a final judgment finding Gina "failed to establish by clear and convincing evidence" the necessary elements to probate a lost holographic will: "(1) the proof of the existence of a will, and (2) proof of its contents." Accordingly, the court denied any relief sought in Gina's counterclaim.

¶19. On October 24, 2023, Gina filed a motion for reconsideration.[4] On March 11, 2024, the chancery court entered a detailed twenty-five-page memorandum opinion and order denying Gina's motion to reconsider. In that opinion, the chancellor held that Gina failed to prove that a validly executed will existed leaving Patricia's estate to her, the contents of such a will, and that Patricia did not destroy any such will. Gina subsequently appealed.

**Witness Testimony**

### Gina Ward's Trial Testimony

---

[4] Gina did not cite a specific rule as a basis for her motion. This Court has instructed, "Notwithstanding the style of a motion, if it challenges the correctness of a judgment and is timely made within ten days, it will be treated as one made under Rule 59(e)" of the Mississippi Rules of Civil Procedure. *Domke v. Domke*, 305 So. 3d 1233, 1244 (¶34) (Miss. Ct. App. 2020) (quoting *DeSoto County v. Standard Constr. Co.*, 283 So. 3d 102, 106 (¶12) (Miss. 2019)). The trial court treated the motion as one under Rule 59(e). This Court has held that in order to succeed on a post-trial motion for reconsideration, the movant must show "(i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice." *Hardin v. Hardin*, 335 So. 3d 1088, 1094 (¶20) (Miss. Ct. App. 2022) (quoting *In re Moore*, 297 So. 3d 316, 323 (¶21) (Miss. Ct. App. 2020)). The court properly reviewed the underlying judgment to determine whether she needed "to correct a clear error of law or to prevent manifest injustice." *Id.*

¶20. Gina testified that she saw, read, and discussed Patricia's 2018 will numerous times. She claimed an incident between Patricia and Cindy precipitated the creation of that will. During a visit to the house of Gina's grandfather in the summer of 2018, Hollis Powell gave Gina a sewing machine belonging to Patricia's mother. When Cindy saw Patricia, Gina, and Reynolds loading the sewing machine into Reynolds's truck, Cindy took photographs and posted them on Facebook, calling them suspected neighborhood thieves. Gina testified that this post "stirred up a lot of things" between Patricia and Cindy. Gina testified that the post upset Powell and "he went off the rails." In response, Powell decided to create a new will, and he told Patricia that "she needed to get her affairs in order." Cindy admitted that she reacted harshly to Gina's receiving the sewing machine, but that she had wanted it for herself.

¶21. Gina testified that she was present the day Patricia redid her will at Powell's house, leaving her estate to Gina, as discussed previously.

### Cindy Edwards's Trial Testimony

¶22. Cindy testified that she had not had a good relationship with Patricia since their mother's death in 2016. The last time she visited Patricia's house was over five years ago. Cindy admitted that she had a key to Patricia's residence and went to her house the evening of June 20, but Cindy denied that she went inside Patricia's house until July 2, 2021. Cindy claimed that $100,000 in artwork was missing from the house. Cindy testified that she had met Gina only about five times since Gina turned eighteen years old.

¶23. Cindy testified that she did not believe Patricia prepared a holographic will for two

9

reasons. First, Patricia was involved in litigation from her divorce, as well as her father's estate. Because Patricia had retained several attorneys due to the litigation she was involved in with her father's estate and divorce, Cindy believed Patricia would have had her attorneys draft a new will. Second, Cindy testified that if Patricia had prepared a new will excluding Cindy, due to the antagonism between them, Patricia would have contacted Cindy to tell her, "[Y]ou're not going to get anything."

### *Gina Ward's Trial Rebuttal*

¶24. On rebuttal, Gina testified that the week of August 14, 2018, she was present when Patricia telephoned Cindy from their father's house and told Cindy she had redone her will, and Cindy was "not getting anything." Gina termed the call "short and sweet." Gina admitted that she did not hear a voice on the other end of the telephone. When asked on cross-examination why she did not relate this account of a telephone call in her deposition, Gina responded, "I believe I did." Cindy's attorney responded, "You did not. You didn't tell me about it in your deposition, and you didn't tell the Court about it on direct, you're only bringing it up now."

### *Cindy Edwards's Trial Rebuttal*

¶25. Cindy denied that this phone call ever took place. Further, through the questions and answers with her attorney, she recounted the activity related to her father's will, without objection. Her father had a will executed in 2011 that made Cindy's son his executor. When Cindy's father passed away in 2020, two years after this purported telephone call, Patricia's attorney called and said there was an updated will in 2018. This was the first time

Cindy had heard that her father had a new will. Cindy affirmed that her father had dementia and that "some people took advantage of him and made him sign a new will in 2018." The court found the father's new will invalid, and Cindy agreed that "those same people are coming to court now alleging a made-up will that nobody saw except them and their buddies. . . ."

### John Barnes's Trial Testimony

¶26. Barnes was the only witness other than Gina and Cindy to testify at trial rather than by deposition. He testified that he knew Patricia, and his wife cleaned Patricia's house and her father's house. Barnes admitted that on June 24, 2021, he took photographs of the outside of Patricia's residence showing Cindy, her husband's truck in the driveway, trash from Patricia's house at the curb, and chains on the front door. Barnes testified that he observed Cindy using a trash can at Patricia's house. He also testified that nobody told him to take the photographs; he wanted to document "any activity that shouldn't have been going on." He testified that he had no personal knowledge of any of Patricia's wills.

### David Reynolds's Deposition Testimony

¶27. Reynolds is Gina's former boyfriend from Oklahoma. He dated Gina for approximately six years until December 2020. While dating, Reynolds would accompany Gina on trips to see Patricia once or twice a year, staying with Patricia or her father. Reynolds stated that Patricia kept many important documents on her kitchen table. Reynolds testified that in March or April 2019, during a visit to Patricia's home with Gina, he saw the 2018 will one time. Reynolds testified that one morning while he and Patricia were sitting

11

alone at the kitchen table having coffee, Patricia showed him her will and told Reynolds she was leaving her estate to Gina. He described the will as short—one page on white legal-size paper handwritten with red ink. He saw Patricia's signature on the bottom of the will, but there were no witness signatures. Reynolds testified that he did not ask Patricia when she wrote the will, if she wrote the will, or whether she signed it. He "just assumed she did . . . [as] she was letting me look at it." Reynolds stated that he "looked over it" but "didn't read it word for word." He testified that from what he saw of the will, Gina was to have Patricia's assets, as well as take care of her and Patricia's father. Reynolds was unaware of the 2005 will. Reynolds was aware, however, of the conflict between Patricia and Cindy, and admitted his dislike of Cindy.[5]

### Dale Pounds's Deposition Testimony

¶28.   Pounds, Patricia and Cindy's first cousin, lives in Arkansas. Pounds testified that he had a very close relationship with Patricia; they spoke on the telephone every two weeks. Pounds testified that Patricia and Cindy did not have a good relationship, and it worsened after the death of their mother. Pounds testified that Patricia told him numerous times, as well as approximately one month before her death, that "Cindy would not be in the will." Pounds admitted that Patricia was not well organized, and at the time of her death, paperwork was lying around her residence. However, Pounds testified that he never saw the 2018 will. Pounds testified that Gina never told him that she had a copy of a will that left everything to her.

---

[5]   Reynolds and Cindy did not get along because Cindy had called him a thief on Facebook for taking the sewing machine in 2018, as previously discussed.

### Billy Hugh Campbell's Deposition Testimony

¶29.   Campbell is Patricia and Cindy's uncle who lives in South Carolina.  Campbell testified that he spoke with Patricia a couple of times per week and visited her four or five times per year.  After Patricia's father passed away, Campbell came to Tupelo and had lunch with Patricia, where they discussed the conflict that had developed between her and Cindy.  Campbell testified that there was "a lot of friction" between Patricia and Cindy.  During the lunch, Patricia told Campbell that she had a will that left everything to Gina.  However, Campbell never saw the will.

### Sam Patrick's Deposition Testimony

¶30.   Patrick was Patricia's twenty-three-year-old handyman (at the time of the deposition) from 2016 until six months prior to Patricia's death.  He would assist Patricia with various tasks once a week or more.  Patrick testified that they became very close and often shared meals and conversation.  He acknowledged that Patricia and Cindy did not have a good relationship.  Patrick testified that in late 2018 or early 2019, Patricia informed him that she had made a new will and was leaving her estate to Gina.  Patrick also testified that Patricia told him the will had a provision that if Patricia's father were still alive, he would be taken care of financially, if needed, before anyone else received anything.  Patrick and Patricia had this conversation while sitting at the kitchen table, with Patricia holding the will.  Patrick glanced at the will but could not read it.  Further, he could not recall if it was typed or handwritten.

### Dee Ward's Deposition Testimony

¶31.    Ward, Gina's adoptive father, was eighty-six years old at the time of his deposition. He lives in Kansas. Ward testified that he visited Patricia and stayed in her home numerous times after Gina and Patricia reconnected around 1986. The last time Ward stayed with Patricia was around January 2020. Ward testified that one morning he and Patricia were having coffee alone, sitting at the kitchen table, when Patricia showed him her will and allowed him to read it. Ward described the will as one page, on white, legal-size paper, handwritten in red ink. He testified the will was signed "Patricia Fleishhacker" and dated November or December 2018. However, Ward did not provide any details regarding the position of the signature. Ward testified the handwriting was Patricia's because he recognized it from several letters of hers. He testified the will left "everything" to Gina, except for a gift of $800 or $1,000 to the Humane Society.

### Tanya Barnes's Deposition Testimony

¶32.    Tanya had been Patricia's housekeeper since 2018. She also worked for Patricia's father during this time. Tanya testified that she saw Patricia's will on the kitchen table numerous times but only glanced at it. Tanya explained that Patricia kept her important documents on the table, including her father's will and her divorce papers. Tanya testified that the will was on white, legal-size paper, with red ink. However, she did not testify that it was handwritten. She claimed that the will had Gina's name on the top of it, but Tanya did not recall any other details. Tanya testified that Patricia made her new will when her father redid his. Tanya acknowledged that Patricia and Cindy "hated each other."

¶33.    Tanya testified that she spoke with Gina nearly every day since Patricia's death and

admitted they are friends. She had not been inside the house since the last time she cleaned it. Tanya admitted that she and her husband took photographs outside of Cindy's house, vehicles, and trash. She observed Cindy and her brother at Patricia's residence and noticed some of Patricia's belongings in the trash can.

### *Jak Smith's Deposition Testimony*

¶34. Smith, an attorney from Tupelo, had been Patricia's attorney since approximately 2011, and they had been friends for twenty to twenty-five years. He was Patricia's counsel in her father's estate proceedings, and he was prior counsel for Gina in this case. Smith testified that for the past four years, Patricia was very clear to him that she "basically hated her sister. . . . Spoke ill of her." He testified that Patricia thought that Cindy was "materially involved in [their] mother's death." Smith visited Patricia frequently at her home and observed that Patricia kept her papers all over her house, as well as in a home safe. Smith testified that Patricia mentioned recently that Gina was to inherit specific items in her home; however, Patricia never asked him to prepare a will, nor had he ever seen her will. Smith testified that based on Patricia's comments, he believed that Patricia had made provisions to leave her estate to Gina. Smith acknowledged meeting with Gina after Patricia's body was found. Smith also recalled that around June 23, 2021, Tanya contacted him about certain individuals at Patricia's house. Smith testified that he went to the house and found Cindy and others there.

## STANDARD OF REVIEW

¶35. "In reviewing a chancellor's findings, we employ an abuse-of-discretion standard of

review." *Mays v. Sumwalt (In re Est. of Amburn)*, 301 So. 3d 737, 740 (¶7) (Miss. Ct. App. 2020) (quoting *Covington v. McDaniel (In re Est. of Necaise)*, 126 So. 3d 49, 56 (¶22) (Miss. Ct. App. 2013)). "This Court will not disturb a chancellor's findings of fact in a will contest unless the findings are clearly erroneous or manifestly wrong, or the chancellor applied an incorrect legal standard." *Id.* Questions of law, however, are reviewed de novo. *Id.* Further, "when the trial judge sits as the finder of fact, [s]he has the sole authority for determining the credibility of witnesses." *Griffith v. Griffith (In re Est. of Griffith)*, 30 So. 3d 1190, 1193 (¶13) (Miss. 2010) (quoting *Yarbrough v. Camphor*, 645 So. 2d 867, 869 (Miss.1994)). "[W]e reiterate that our trial courts are entitled to deferential review in matters involving questions of fact." *Id.*

## ANALYSIS

¶36.    Gina claims that the trial court "misconstrued the facts" and "misapplied the law to the facts" in finding that Gina failed to prove a validly executed will existed, what the contents of such a will were, and that Patricia did not destroy that will. Gina argues that there was sufficient evidence to establish that Patricia made a holographic will and that it was validly executed.

¶37.    The process of probating a will in Mississippi is controlled by statutory provisions. "[T]he execution of a [w]ill is a statutory privilege and not a constitutional or common law right." *McKellar v. Thrash (In re Est. of McKellar)*, 380 So. 2d 1273, 1275 (Miss. 1980). "No matter how earnestly one may desire and intend to make a will, a paper, although fully intended by the writer to be a will, is ineffective and invalid unless its execution meets

16

statutory requirements." *Swilley v. Est. of LeBlanc (In re Est. of Regan)*, 179 So. 3d 1155, 1158-59 (¶11) (Miss. Ct. App. 2015) (quoting *Wilson v. Polite*, 218 So. 2d 843, 849 (Miss. 1969)).

¶38.    Our courts have permitted "proof to establish the existence, proper execution, and contents of wills no longer existing." *Deposit Guar. Nat'l Bank v. Cotten*, 420 So. 2d 242, 245 (Miss. 1982) (citing *Veazy v. Turnipseed*, 219 Miss. 559, 565, 69 So. 2d 379, 382 (1954)).  In order to probate a lost will, the proponents must prove by clear and convincing evidence (1) its existence and proper execution, (2) its loss or destruction, and (3) its contents.  *Veazey*, 219 Miss. at 565, 69 So. 2d at 382.  "A fourth element has been added: (4) that the testator did not destroy the will with the intent to revoke it." *Easley v. Ferguson (In re Est. of Cannon)*, 733 So. 2d 245, 249 (¶19) (Miss. 1999) (citing Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 7:17 (1st ed. 1988)).  "This last element arose from the theory that when a will cannot be found following the death of a testator and it can be shown that the testator was the last person in possession of the will, there arises a rebuttable presumption of revocation." *Cannon*, 733 So. 2d at 249 (¶19).  We shall discuss each requirement in turn.

## I.    Existence of the Will, Proper Execution, and Contents

¶39.    Gina argues that the testimony demonstrates Patricia properly created and executed a holographic will in 2018 that was lost.  "The evidence in a proceeding to probate a lost or destroyed will must be sufficient to establish the will's proper execution." Jeffrey Jackson & Mary Miller, 9 *Encyclopedia of Mississippi Law* § 75:137, at 104 (2d ed. 2002).  The

17

statutory "prescri[b]ing formalities for the execution of wills . . . is to guard against mistakes, impositions, undue influences, fraud, deception, etc. . . . . The formalities are for the testator's protection also, as well as the beneficiaries." *Wilson*, 218 So. 2d at 849.

¶40.  "A holographic will is a will written entirely in the handwriting of the testator" and is valid in Mississippi if certain requirements are met. Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 3:10, at 104 (3d ed. 2003) (citing Miss. Code Ann. § 91-5-1 (Rev. 2021)). "Valid execution of a holographic will requires that it be wholly written in the handwriting of the testator and that it be subscribed." *Id.* § 4:12, at 124. "'[S]ubscribed' . . . means to be signed at the end." *Id.* "An unsubscribed holographic will is void, even if there is no doubt that the testator wrote it." *Id.* To be admitted to probate, a will that is wholly written and subscribed (i.e., holographic) "may be proven by the affidavits of two disinterested persons who are familiar with the decedent's handwriting . . . provided the will is not being contested." *Id.* § 7:9, at 166 (citing Miss. Code Ann. §§ 91-7-10 to -11 (Rev. 2021)). Mississippi Code Annotated section 91-7-10 provides in its entirety:

> *Where there is not contest about it*, a holographic will or codicil may be proved at the time of *presentment for probate by the affidavits*, made before an officer in the state authorized to administer oaths, of at least two (2) persons, *in no wise interested in the estate of the testator or testatrix*, attesting to the authenticity of the will or codicil and the competency of the testator or testatrix to make testamentary disposition of his or her property; provided, however, that such affiants shall be persons *familiar with the handwriting and signature of the testator or testatrix*, and the affidavits so presented shall contain statements made on the personal knowledge of such affiants *attesting that such handwriting and such signature are genuine and were made and done* by the testator or testatrix; and in such case the affidavits made and presented in conformity herewith *may be received as a substitute for the*

18

*personal attendance of witnesses to prove such will* or codicil.

(Emphasis added).[6]

¶41.    First, the trial court determined that Gina had not proved by clear and convincing evidence that Patricia's holographic will had been "wholly written and subscribed by her" or proved valid by the affidavits of at least two individuals "in no wise interested in the estate" of Patricia.

¶42.    Gina testified that the will was a single-page, legal-size sheet of paper, handwritten in Patricia's handwriting, in red ink, and signed by Patricia.  Most importantly, the trial court found Gina's testimony "insufficient to satisfy the requirements of [s]ection 91-7-10 based on her status as the primary beneficiary under the purported will and the legislative requirement of proof by persons 'in no wise interested in the estate.'"  By its terms, however, section 91-7-10 applies only to the affidavits presented with the will for probate "[w]here there is not contest about it."  The statute does not apply to the testimony of witnesses in a will contest.  During most of our State's history, the result would have been the same at trial due to the so-called "Dead Man's Statute," which was codified in some form from 1857 until 1991.  *See Griffin v. Lower*, 8 George 458, 459, 37 Miss. 458, 459 (1859) ("Prior to the passage of this act, it was competent for either party in the *justices' court* to prove his claim by his own oath . . . .").

¶43.    In its last form, Mississippi Code Annotated section 13-1-7 (1972) (repealed 1991)

---

[6] If a will is "not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix." Miss. Code Ann. § 91-5-1.

provided, in pertinent part, "A person shall not testify as a witness to establish his own claim or defense against the estate of a deceased person, which originated during the lifetime of such deceased person, or to establish any claim he has transferred since the death of such decedent." The Mississippi Supreme Court noted that the purpose of the statute was to prevent "false swearing"—a "surviving party should not have the benefit of his own testimony where the adversary's lips are closed by death" and "to prevent injustice where there is no one to dispute or refute such testimony." *Poole v. McCarty*, 240 Miss. 341, 347-48, 127 So. 2d 398, 401 (1961) (citing 58 Am. Jur. *Witnesses* § 215 and 97 C.J.S. *Witnesses* § 132b, respectively).

¶44.    As noted, the statute was repealed in 1991, and the surviving party is not incompetent to testify at trial. Professor Robert Weems explained that the effect of the Dead Man's Statute as it applied to will contests "was to prevent all interested parties from testifying at the will contest trial. This is no longer the case since this statute was repealed upon adoption of the Mississippi Rules of Evidence." Weems, *supra* ¶40, § 8:24, at 212. Accordingly, Gina was not incompetent to testify at the will contest to establish the existence of the holographic will. Her testimony, if found credible by the trier of fact, might be significant, possibly with the addition of other evidence, to establish the execution, existence, and terms of the holographic will.[7] Neither of the parties brought the repeal of the Dead Man's Statute

---

[7] As to an attested will, as described in footnote six, a beneficiary under that will may, with the repeal of the Dead Man's Statute, be a "credible witness." However, Mississippi Code Annotated section 91-5-9 (Rev. 2021) still provides that "[i]f any person be a subscribing witness to a will wherein any devise or bequest is made to him and the will cannot otherwise be proven, such devise or bequest shall be void . . . ."

20

to the attention of the chancellor.

¶45. We do not know whether the chancellor, the trier of fact in this case, actually believed Gina's testimony. The chancellor did note, however, that the testimony regarding the telephone call from Patricia to Cindy was brought out "on rebuttal," possibly indicating that she found it suspicious. The chancellor also noted that Gina had not specified if the will was subscribed.

¶46. Neither of the two other witnesses[8] who claimed to have seen the holographic will met all the requirements to prove the validity of the will. Reynolds, Gina's former boyfriend, testified that Patricia had shown him the 2018 will once while they were sitting alone at the kitchen table. Reynolds described it as short—one page—handwritten in red ink on legal-size paper. He testified that Patricia's signature was "[a]t the bottom of the page" with no witness signatures. Reynolds admitted that he had not seen Patricia execute the will. Further, he did not ask Patricia if she wrote the will but merely "assumed she did." The trial court also found Reynolds's testimony was unclear if her signature was at the end of the writing, and if "some of the alleged terms did not appear thereafter."

¶47. Ward, Gina's adoptive father, testified that Patricia showed him the 2018 will once around January 2020, while he and Patricia were sitting alone at the kitchen table. Ward described it as handwritten in red ink on white, legal-size paper. He testified it was signed

---

[8] Again, as section 91-7-10 does not apply to trial testimony or evidence in a will contest, the requirement of two witnesses would not necessarily apply at trial if the chancellor found the testimony of someone of such caliber to satisfy the clear and convincing evidence standard for this lost will. However, we find no abuse of discretion in the trial court's use of the two-witnesses requirement in determining clear and convincing evidence.

21

and dated by Patricia, and in her handwriting, which Ward recognized due to letters he had received from her. The trial court, however, found that Ward did not provide any details regarding the position of the signature, i.e., that it was subscribed.

¶48. Reynolds and Ward were the only witnesses besides Gina who testified to having read the holographic will; however, Reynolds could not confirm that the will was in Patricia's handwriting, and Ward did not testify that the will was subscribed. Therefore, if Gina's testimony were taken into account, there would still be only one witness to testify that the will was subscribed, and the trial court might still find the testimony did not satisfy the high burden of clear and convincing evidence necessary to prove the valid execution of the lost holographic will.

¶49. As to the contents of the will, the trial court again failed to consider the testimony of Gina. She argues that the following testimony was sufficient to prove the contents of the will. Ward, Campbell, Patrick, Reynolds, and Gina all testified that Patricia had told them she was leaving her estate to Gina. Similarly, Pounds testified that Patricia told him Cindy was not in her will, and Smith testified that Gina would inherit certain items from Patricia. Patrick testified that Patricia had made a new will and was leaving her estate to Gina. Ward and Gina both testified that Patricia's holographic will made a gift to the Humane Society, and, additionally, Gina testified a ring would be given to Patricia's friend Betty.

¶50. "The necessity of clear and convincing proof appears to be most acute with regard to proof of the contents of the lost or destroyed will." Weems, *supra* ¶40, § 7:15, at 172 (citing *Warren v. Sidney's Estate*, 183 Miss. 669, 184 So. 806, 807 (1938)). The trial court

found this evidence insufficient to establish the contents of the will. Most of the proof Gina points to about her receiving the estate is oral—witnesses were "told" by Patricia that Gina was to inherit her estate. The only witnesses who testified to having seen the contents of the will were Gina, Reynolds, and Ward. Gina testified that Patricia left all her assets to her, instructed her to care for her grandfather, give $1,000 to the humane society, and give a yellow diamond ring to Patricia's best friend Betty. Gina's testimony was most complete but was not considered by the trial court due to the misapplication of section 91-7-10. Reynolds's and Ward's testimony is problematic. Reynolds's testimony was similar to Gina's testimony—from what he saw of the will, Patricia wanted Gina to take care of Powell and to have her assets and personal property. However, he did not read it "word for word." Ward initially testified that Patricia told him "everything goes to Gina," but then he testified that when he read the will, Patricia "wanted to give everything she had more or less to Gina." Ward testified that Patricia's father wanted a gift of $800 to $1,000 to be made to the Humane Society. However, the trial court noted the timing of Ward's conversation with Patricia about these details, which he stated was in November or December 2020, is problematic because Powell passed away in February 2020. Barnes had no direct knowledge of the will's contents. Pounds, Campbell, and Patrick never saw the actual will.

¶51. We agree with the trial court that without Gina's testimony, the testimony of the remaining witnesses about the content of the will was "too speculative and conflicting to identify the precise terms of the will" under the high burden of proof. This is especially true regarding the care of Powell, the disposition of the ring to Betty, and the amount of the

23

bequest to the Humane Society. But for the trial court's findings regarding destruction and revocation of the will, we would reverse and remand for the trial court to consider Gina's testimony; however, as explained below, it is not necessary, given the repeal of the Dead Man's Statute.

## II. Loss of the Will

¶52. The trial court found it "was uncontroverted" that the will was lost. We note that Cindy did not agree that the will was lost and instead contends that it never existed.

## III. Destruction and Revocation of the Will

¶53. Lastly, Gina contends that there is insufficient evidence to prove that Patricia destroyed the 2018 will.

¶54. Regarding the probate of a lost or destroyed will, the final requirement is that

> the proponent must prove that the will was not destroyed by the testator with the intent to revoke. *This will probably be a difficult task if the will was last known to be in the possession of the testator because in that case there is a presumption that the testator did destroy the will with intent to revoke. If a contestant of the will also had access to it the presumption can be defeated with slight evidence.* If the will was not shown to be in his or her possession, there is no such presumption. However, even if the presumption is raised, it is rebuttable and may be overcome by evidence to the contrary. But the evidence to rebut must be clear and convincing.

Weems, *supra* ¶40, § 7:15, at 173 (emphasis added) (citations omitted). The Mississippi Supreme Court has admitted: "It is difficult to lay down any general rule as to the nature of the evidence which is required to rebut the presumption of destruction: [i]t depends to a considerable extent on the testator's property and his relations towards his family." *Smith v. Tallant (In re Est. of Tallant)*, 644 So. 2d 1189, 1195 (Miss. 1994) (quoting *Berry v. Smith*

24

*(In re Est. of Leggett)*, 584 So. 2d 400, 403 (Miss. 1991)).

¶55.    The trial court analyzed this factor in the alternative, as if the other factors had been satisfied. There is no indication that the trial court failed to consider Gina's testimony on this issue. The trial court noted that Gina testified Cindy continued to have a key to Patricia's home even though they were in litigation against each other regarding their father's estate and generally at odds with one another. However, the trial court found no evidence that Cindy entered Patricia's home between January 2020 (when Ward stated he last saw the 2018 will) and June 22, 2021 (when Gina and Tanya entered Patricia's home to look for the 2018 will). The 2018 will was last noted in Patricia's possession. Based upon the testimony of many witnesses, the 2018 will would have been among other important documents on Patricia's kitchen table. When Gina could not find the will there, she suggested it was in Patricia's safe; however, when the safe was opened, the only will found there was the original 2005 will. Further, at the time Gina searched for the will on the table, she testified Patricia's residence appeared undisturbed, although stacks of papers had been moved.

¶56.    Gina argues that even though proving that Patricia lost or destroyed the will is "a difficult task if the will was last known to be in the possession of the testator," since Cindy had access to the will due to her key to Patricia's house, the presumption Patricia lost or destroyed the will "can be defeated with slight evidence." Gina points to the following evidence. Cindy testified that she went to Patricia's house June 21, 2021, the day after the body was found. Gina claims Cindy, her brother, and her husband were "in and out of the

25

house in the days after" the discovery, and Cindy had the front door chained. Further, Gina points to Barnes's photographs of the trash cans outside of Patricia's house, which were full of Gina's clothing that she had left in Patricia's house.

¶57. The trial court concluded that Gina failed to prove by clear and convincing evidence that Patricia did not destroy the lost will with the intent to revoke it. We agree. Although Gina gives several instances after Patricia's death where Cindy was at the house, Cindy denied actually entering the home until July 2, 2021, and Gina provides no evidence to the contrary. Cindy testified she did not enter the home on June 21 but, rather, "just walked around" and made sure the door was locked. On June 23, Cindy testified she was outside of the house with her husband, but she again denied entering the house—only her husband and Smith did so. Even the photographs taken by Barnes do not show Cindy actually inside the house. There was no proof offered that Cindy entered the house from January 2020 until June 22, 2021, when Gina searched the house for the will. And, if Cindy's testimony were believed, she did not even know there was a second will to find until advised of its existence by Gina on June 23. The chancellor did not err in finding insufficient proof to meet this requirement given the credibility decisions the chancellor was allowed to make. While Cindy had a key to the house, the chancellor refused to speculate that Cindy entered the house and took or destroyed the 2018 will—which, as the fact finder, she was permitted to do. The presumption remains that the holographic will left on Patricia's table was destroyed by her with the intent to revoke it. She never destroyed the original 2005 will, but kept it secure in her home safe.

26

## CONCLUSION

¶58.    While we would reverse and remand for additional findings by the trial court, given the repeal of the Dead Man's Statute and its effect on this case, we affirm based on the trial court's findings on the revocation.

¶59.    **AFFIRMED.**

**CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR. WILSON, P.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. WEDDLE, J., NOT PARTICIPATING.**